# THE STATE v. TODD, Appellant.

## Division Two, March 6, 1906.

1. **STATEMENT: Other Crimes.** Where the court, over the objection and exception of defendant, has permitted the prosecuting attorney in his opening statement to tell the jury that the testimony would show that two or three hours before the homicide the defendant assaulted a third person and struck him over the head with a pistol, and the statement was closed without in any wise connecting that difficulty with the shooting of deceased, the court could not rebuke the prosecuting attorney, but he could cure the error by orally directing the jury at the close of the statement to disregard it, and by stating that no testimony on the subject would be received and by doing whatever the court could do to eliminate it from the case.

2. ————: ————: **Waiver.** Any objection defendant may have to a statement by the prosecuting attorney concerning a prior difficulty between defendant and a third party is waived by the persistence of defendant's counsel in injecting that difficulty into his statement after the court has directed the jury to disregard that part of the prosecuting attorney's statement and announced that no evidence in regard to it would be received.

3. **MURDER: Hearsay: Statement by Deceased: Non-Prejudicial.** As deceased was crossing the street towards the sidewalk, a clerk in a store saw defendant coming down the sidewalk towards the store, cursing deceased and calling him vile names, and the clerk, supposing that deceased would go up the sidewalk and meet defendant, was permitted to testify that he said to deceased, "Uncle Bob, you had better come in the store,". and that deceased replied, "My stars, I will have no trouble with him." When the men met, a difficulty ensued, but they were separated by friends. This was two or three hours before the homicide. *Held*, that the clerk's testimony was hearsay, and improperly admitted, but was non-prejudicial, and hence, not reversible error.

4. ————: **Instruction on Second Degree.** Defendant testified that as deceased rode past his office deceased straightened himself up in his saddle and gave defendant a very angry look, and that he did not shoot at him until he had proceeded about fifteen feet, checked up his horse and made a motion with his right hand towards his hip pocket; that he then stepped out into

State v. Todd.

the street, drew his pistol and began shooting and continued to shoot until defendant fell from his horse. *Held*, that this testimony, if true, did not show that the shooting was done deliberately, but did show that it was done willfully, premeditatedly and of malice aforethought, and hence was sufficient to support an instruction on murder in the second degree.

5. ———: ———: **Evidence of Murder in First Degree.** Where the jury may from the evidence find defendant guilty of murder in either degree, it is not error to give an instruction for murder in the second degree.

6. ———: ———: ———: **Defendant's Right to Complain.** And even if the testimony does not warrant an instruction for murder in the second degree, but only one for murder in the first degree, defendant cannot complain at the giving of an instruction for murder in the second degree, for the error is in defendant's favor, in that it instructs for a lesser offense than that with which he is charged.

7. ———: ———: **Necessary Facts.** The instruction told the jury that before they could find the defendant guilty of murder in the second degree they must believe from the evidence, beyond a reasonable doubt, that defendant, with a pistol, shot and killed deceased, and that such shooting and killing were done willfully, premeditatedly and of malice aforethought, but without deliberation (those terms being defined in another instruction). *Held*, that this instruction sufficiently indicated to the jury what facts were necessary for them to find in order to convict defendant of murder in the second degree.

8. **MANSLAUGHTER: Instruction: Prior Threats and Trouble.** To authorize an instruction on manslaughter in the fourth degree there must be evidence tending to show that defendant, in the heat of passion induced by reasonable provocation, without malice and without premeditation, shot and killed the deceased; and the passion which will reduce homicide to the grade of manslaughter is an excited state of mind produced by some lawful provocation, such as a blow or an assault of any kind upon the person. And where there was no evidence that deceased made any remarks to or in the presence of deceased or that he made any assault upon him at the time of the homicide, there is nothing upon which to base such an instruction, although an intense hatred had long existed between him and defendant, and they had often threatened each other, and had had one or two personal encounters, one of which occurred only a few hours before the homicide.

Appeal from Vernon Circuit Court.—*Hon. H. C. Timmonds*, Judge.

State v. Todd.

Affirmed.

*A. J. King, C. G. Burton* and *W. M. Williams* for appellant.

(1) The remarks of the attorney for the State in his opening statement concerning the Claypool difficulty must have influenced the minds of the jurors. The subsequent direction of the court could not remedy the wrong that had already been done. State v. Jackson, 95 Mo. 652; State v. Stubblefield, 157 Mo. 360; Evans v. Trenton, 112 Mo. 399; State v. Kennedy, 177 Mo. 116; State v. Kring, 67 Mo. 595; State v. Lee, 66 Mo. 167; State v. Shipley, 174 Mo. 512. (2) The conversation between witness Cox and deceased was not a part of the *res gestae* and was hearsay testimony. State v. Kennedy, 177 Mo. 180; State v. Curtis, 70 Mo. 594; McMillan v. State, 13 Mo. 30; State v. Punshon, 124 Mo. 451; State v. Burrell, 145 Mo. 1; State v. Umfried, 76 Mo. 414; State v. Ware, 62 Mo. 597; State v. Evans, 65 Mo. 574; State v. Day, 100 Mo. 242. (3) To constitute murder in the second degree the killing of Wall must have been done while the defendant was in a heated state of the blood, as contra-distinguished from "deliberation" and technical "heat of passion," caused by some conduct on the part of Wall amounting to a "just provocation" and not to a "reasonable," "adequate," "sufficient," "lawful or legal" provocation. State v. Ellis, 74 Mo. 216; State v. Curtis, 70 Mo. 599; State v. Gee, 85 Mo. 649; State v. Niehaus, 188 Mo. 324; State v. Turlington, 102 Mo. 660; State v. Bulling, 105 Mo. 221; State v. McKinzie, 177 Mo. 711; State v. Berkley, 109 Mo. 673. (4) There was no testimony tending to prove murder in the second degree, and therefore instruction 5 was erroneous. State v. Mahley, 68 Mo. 315; State v. Phillips and Ross, 24 Mo. 490; State v. Niehaus, 188 Mo. 324; State v. Ellis, 74 Mo. 217; State v. Kotovsky, 74 Mo. 249; State v.

Lewis, 74 Mo. 223; State v. Punshon, 124 Mo. 458; State v. Allen, 116 Mo. 548; State v. Curtis, 70 Mo. 599. (5) An assault on the part of deceased involving personal violence to the defendant or evincing an intent to do defendant bodily harm, is such a provocation as reduces the homicide to manslaughter. 21 Am. and Eng. Ency. Law (2 Ed.), 178, 173, 182; State v. Garrison, 147 Mo. 556; Stevenson v. U. S., 162 U. S. 313; Johnson v. State, 2 S. W. 609; 2 Bishop, New Crim. Law (8 Ed.), sec. 710; State v. Gee, 85 Mo. 647; State v. Elliott, 98 Mo. 157. (6) And it is a question for the jury to determine whether the killing was because of the provocation or from malice. Stevenson v. U. S., 162 U. S. 320; Wallace v. U. S., 162 U. S. 476; 21 Am. and Eng. Ency. Law (2 Ed.), 175; State v. Gee, 85 Mo. 647; State v. Elliott, 98 Mo. 157. (7) Upon the testimony the court should have given an instruction on manslaughter in the fourth degree. 21 Am. and Eng. Ency. Law (2 Ed.), 178, 173, 182, 175; Stevenson v. U. S., 162 U. S. 313; Johnson v. State, 2 S. W. 609; 2 Bishop, New Crim. Law (8 Ed.), sec. 710; Wallace v. U. S., 162 U. S. 476; State v. Garrison, 147 Mo. 556; State v. Weakley, 178 Mo. 423; State v. McKinzie, 177 Mo. 709; State v. Umfried, 76 Mo. 404; State v. McKinzie, 102 Mo. 632; State v. Edwards, 70 Mo. 600; State v. Berkley, 92 Mo. 54; State v. Curtis, 70 Mo. 600; State v. Gee, 85 Mo. 653; State v. Elliott, 98 Mo. 157.

*Herbert S. Hadley,* Attorney-General, and *John Kennish,* Assistant Attorney-General, for the State; *Scott & Bowker* and *M. T. January* of counsel.

(1) Evidence of the fight with Claypool just before defendant attempted to assault the deceased was admissible, and the court erred in defendant's favor in refusing to permit the State to show the same or make use of it in the opening statement to the jury. State v. Pennington, 124 Mo. 388; State v. Dettmer, 124 Mo.

426; State v. Nelson, 166 Mo. 191; State v. Bailey, 88 S. W. 733; State v. Raper, 141 Mo. 327; State v. Kennade, 121 Mo. 405; State v. Gabriel, 88 Mo. 631; State v. Williamson, 106 Mo. 162. (2) If there was any error in the prosecuting attorney making reference to this matter in his opening statement, it was cured by the action of the court thereon. State v. Degonia, 69 Mo. 485; State v. Howard, 118 Mo. 127; State v. McMullen, 170 Mo. 608; State v. Pennington, 124 Mo. 388. (3) If the defendant was not satisfied with the action of the court in regard to this action upon the remarks of the prosecuting attorney concerning the Claypool difficulty, he should have asked the court for a more pointed rebuke or instruction in regard to such matter and saved an exception to the court's action in refusing to give it. Otherwise, he can not complain of the court's action in said matter. State v. Howard, 118 Mo. 127; State v. McMullen, 170 Mo. 608. 1. The objection of counsel for appellant to the statement of the attorney for the State concerning the Claypool altercation was a general objection without assigning any specific reason therefor. The same rule should apply in such case as in the case of a general objection to the admission of evidence. State v. Harlan, 130 Mo. 381; State v. Hilsaback, 132 Mo. 348; State v. Wright, 134 Mo. 404; State v. McLaughlin, 149 Mo. 19; State v. Dent 170 Mo. 398. 2. Even if evidence of the Claypool altercation were incompetent, the statement of the attorney for the State concerning such difficulty would not be error of which appellant could complain, for the reason that counsel for appellant thereafter re-stated to the jury the facts concerning the same difficulty. (4) The attempt of defendant to assault Wall, the deceased, two hours before the actual killing, was a part of the res gestae of the killing, and the statement of Wall to Hubert Cox, while that difficulty was going on, was clearly admissible. 2 Bishop's New Crim. Pro., sec. 625; Underhill on Crim. Ev., secs. 99. 100; Wharton's Crim. Ev. (9 Ed.), sec.

262; State v. Nelson, 166 Mo. 191; State v. Gabriel, 88 Mo. 631; State v. Hudspeth, 159 Mo. 176; State v. Martin, 124 Mo. 514; Thomas v. State, 67 Ga. 460; Hunter v. State, 40 N. J. L. 495. (5) The evidence in this case warranted an instruction and conviction for murder in the second degree. State v. Ashcraft, 170 Mo. 409; State v. Elliott, 98 Mo. 350; State v. Atchley, 186 Mo. 174; State v. McMullen, 170 Mo. 609; State v. Hall, 168 Mo. 475; State v. Hudspeth, 150 Mo. 12; State v. Diller, 170 Mo. 1; State v. Sumpter, 153 Mo. 436; State v. Bell, 136 Mo. 120; State v. Frazier, 137 Mo. 317. (6) Even if the testimony only warranted a conviction of the defendant for murder in the first degree, or acquittal on the ground of self-defense, he could not complain of the court's action in giving an instruction for murder in the second degree. The verdict of the jury finding him guilty of murder in the second degree would have to be sustained, although the evidence showed him to be guilty of a higher degree. Sec. 2369, R. S. 1899; sec. 2535, R. S. 1899; State v. McMullen, 170 Mo. 609; State v. Hall, 168 Mo. 475; State v. Bulling, 105 Mo. 204; State v. Nelson, 88 Mo. 126; State v. Wagner, 78 Mo. 644; State v. Billings, 140 Mo. 193; State v. Kindred, 148 Mo. 270; State v. Bell, 136 Mo. 120; State v. Frazier, 137 Mo. 317. (7) The court did not err in failing to give an instruction for manslaughter under the evidence in this case. State v. Diller, 170 Mo. 1; State v. Ashcraft, 170 Mo. 409; State v. Kindred, 148 Mo. 270; State v. Sumpter, 153 Mo. 436; State v. Meadows, 156 Mo. 110; State v. Gartrell, 171 Mo. 489; State v. Martin, 124 Mo. 514; State v. Hall, 168 Mo. 475; State v. Atchley, 186 Mo. 174; State v. Brown, 64 Mo. 367. (8) Mere words or gestures, independent of any assault and battery, are not sufficient to reduce a homicide to manslaughter. State v. Brown, 64 Mo. 367; State v. Elliott, 90 Mo. 350; State v. Hudspeth, 150 Mo. 12; State v. Starr, 38 Mo. 270; 21 Am. and Eng. Ency. Law (2 Ed.), 182; State v. Gartrell, 171 Mo. 489; State v. Martin, 124

Mo. 514. (9) The instruction of the court for murder in the second degree was in proper form and has been approved by this court many times. State v. Bauerle, 145 Mo. 1; State v. Elliott, 98 Mo. 150; State v. Atchley, 186 Mo. 174; State v. Ashcraft, 170 Mo. 409; State v. Moxley, 102 Mo. 374; State v. Kinder, 184 Mo. 295.

BURGESS, P. J.—On an information filed in the circuit court of Vernon county by the prosecuting attorney of said county, in which the defendant, Joseph B. Todd, is charged with murder in the first degree, for shooting and killing one Robert T. Wall at said county, defendant was convicted of murder in the second degree, and his punishment assessed at imprisonment in the penitentiary for a term of twelve years. In due time, after said conviction, defendant filed motions for new trial and in arrest, which were overruled, to which rulings of the court defendant duly excepted, and brings the case to this court by appeal for review.

The homicide occurred at Richards, a village of some two or three hundred inhabitants, in said county, on the 20th day of May, 1904. There had been bad feeling of long standing between the parties which seemed to increase as time passed, until an intense hatred grew up between them. They had one or two personal encounters as well as frequent quarrels, many threats were exchanged, and they frequently went armed, as if each was apprehensive of an assault upon him by the other. Defendant was especially vindictive, and at various times, in the presence of others, charged deceased with being dishonest, a scoundrel and a tax dodger. Charges of a similar character were also made by deceased against defendant. Several months before the killing, Wall acquired by purchase from one Claypool a tract of land about one mile north from Richards, through which defendant had been accustomed to travel in order to get to another tract owned by him and ad-

joining the Claypool tract. After Wall bought this land from Claypool he fenced it in; but regardless of this fact, and against the protests of deceased, defendant and son threw down the fence and passed through the land as usual. A few days thereafter, when defendant and his son appeared at the fence for the purpose of tearing it down and passing through Wall's land, they were intercepted by Wall who, with a double-barrel shot gun in his hands, warned them not to do so, when they left. There was evidence tending to show a preconcerted plan upon the part of Wall to destroy defendant's practice as a physician and compel him to leave the town, and to that end he induced another physician to locate there, agreeing to defray his expenses until he became established in his practice at that place.

The defendant and Wall were both residents of Richards. The main business street of the town is eighty feet wide, running north and south. Defendant's office was located on the west side of this street, and deceased conducted a store also on the west side of said street and about half a block south of defendant's office. South of Wall's store, in the same block and on the same side of the street, was located Dr. Adams' drugstore, and just across the street, east of the drugstore, was a lumber yard.

Some time prior to the homicide defendant was sued by one Kauffman for damages alleged to have been sustained by him by fire which had been set out on defendant's land and which, through defendant's negligence, spread to Kauffman's land, and defendant made statements to the effect that the suit would not have been pressed but for Wall. Between seven and eight o'clock on the morning of the homicide, and about two hours before it occurred, the defendant, in a conversation had in his office with Mrs. Claypool, said that Wall was to blame for the suit brought against him by Kauffman. Immediately after this conversation the defendant had a quarrel with and assaulted Mrs. Clay-

pool's husband. He then looked south and saw the deceased, some four hundred feet distant, crossing the street from the lumber yard to Adams' drugstore. Defendant started south towards Wall's store. He was then without coat or hat, in an excited condition, and had a pistol in his hand, but which he put in his pocket. Wall crossed the street and went to the drugstore and from there to a position in front of his own building, where he and the defendant met. Defendant began immediately to abuse and curse the deceased, but friends interfered and kept the men apart. Cox, a witness for the State, over the objection of defendant, was permitted to testify that as Wall came to the drugstore he, Wall, said to witness, "My stars, I will have no trouble with him," meaning defendant. Shortly after this difficulty between defendant and deceased, the latter rode out to his farm on horseback. Returning from his farm, he rode by defendant's office. Defendant at the time was sitting in a chair in front of his office. Wall was riding very near the center of the street, with the bridle reins and his riding whip in his left hand, and his right hand hanging down by his side. As he rode by he straightened up in the saddle, and looked at defendant and continued to look until there was some little distance between them. As to what then occurred the evidence is conflicting. The State's evidence tended to show that about this time Wall took his eyes off defendant and faced south, the direction in which he was riding, while the evidence upon the part of the defendant tends to show that when deceased had ridden about ten feet past the defendant he checked his horse almost to a standstill, the horse facing southwest or west, and Wall looking at the defendant; that defendant then arose from his chair and walked to the edge of the sidewalk and that Wall loosened his reins and the horse started south; that defendant stepped out in the street and fired four shots at Wall, two of which took effect

and were mortal. One of the shots entered the head, near the temple, about two and a half inches above the right eye, the bullet ranging downward and slightly back, in the direction of the left ear. The other wound was in the back, about two and a half or three inches to the left of the spinal column, between the hip and short ribs. Another of the bullets struck the horse in the left jaw, entering from the rear and coming out at the mouth. As a result of the shooting Wall fell from his horse about forty-four feet south of where defendant had been sitting on the chair, and when picked up, immediately afterwards, he was found unconscious. He died twelve minutes after twelve o'clock on the day of the shooting. When Wall was picked up he was carried to the office of Dr. Adams and placed upon a surgeon's chair. An examination was then made of his pockets by three persons, but no pistol was found upon his person. Subsequently, however, when the body was being prepared for burial, a loaded pistol was found in his right hand coat pocket. In the meantime, after Wall's death and while he was lying upon the surgeon's chair, Dr. Tommy Todd, a son of the defendant, came in and felt the wounded man's pulse with one hand and ran his other hand down upon or into Wall's coat pocket on the right side. Dr. Tommy Todd, however, testified that he did not put his hand in Wall's pocket and that he had no pistol or anything else in his hands or pocket; that he did not put a pistol in Wall's pocket; and did not know whose pistol was found there.

The defendant testified that when deceased appeared in front of his office, just before the shooting, he occupied a natural position in the saddle, but that deceased at once straightened himself up and fixed his eyes upon defendant, and gave defendant a very angry, vicious and terrifying look which scared him greatly; that he, defendant, continued to sit upon his chair until deceased, who still kept his eyes upon defendant, had ridden south fifteen feet or more, when de-

ceased checked and drew his horse a little to the right, the animal's head being turned a little to the south; that he, defendant, then rose from his chair, and deceased went to his pocket, as defendant supposed, for a pistol, and that defendant then stepped out in the street a few feet, pulled out his pistol and fired; that he hesitated after firing the first shot to see whether he would be compelled to further defend himself, but that deceased turned his horse's head toward defendant and continued his efforts, as defendant thought, to get a pistol out of his pocket; whereupon defendant, fearing that deceased was going to shoot him, raised his pistol again and fired three times as rapidly as he could.

Over the objections and exceptions of defendant, the court instructed the jury as follows:

"2. The defendant is presumed to be innocent. Before you can convict him the State must overcome that presumption by proving him guilty beyond a reasonable doubt. If you have a reasonable doubt as to his guilt, you should acquit him. But a doubt, to authorize an acquittal, should be a substantial doubt, founded on the evidence, and not a mere possibility of innocence.

"3. You are the sole judges of the credibility of the witnesses and of the weight and value to be given to their testimony. In determining such credibility, weight and value, you should take into consideration the character of the respective witnesses, their manner on the stand, their interest (if any) in the result of this trial, their relations to and feelings for or against the deceased and the defendant, the probability or improbability of their statements, their opportunities for seeing, knowing and understanding the facts about which they have testified, as well as all other facts and circumstances appearing in evidence. And if you shall believe that any witness has knowingly and intentionally sworn falsely as to any material fact in this case, then you are

at liberty to disregard the whole or any part of the testimony of such witness.

"4. If you shall believe from the evidence, beyond a reasonable doubt, that the defendant, in the month of May, 1904, at Vernon county, Missouri, with a pistol, shot and killed Robert T. Wall, and that such shooting and killing was done willfully, deliberately, premeditatedly and of malice aforethought, you should find the defendant guilty of murder in the first degree. Unless you do so believe, you should not find him guilty of murder in the first degree.

"5. If you shall believe from the evidence, beyond a reasonable doubt, that the defendant, in the month of May, 1904, at Vernon county, Missouri, with a pistol, shot and killed Robert T. Wall, and that such shooting and killing were done willfully, premeditatedly, and of malice aforethought, but without deliberation, you should find the defendant guilty of murder in the second degree. Unless you do so believe, you should not find him guilty of murder in the second degree.

"6. As used in these instructions, the expressions 'wilfully,' 'deliberately,' 'premeditatedly' and 'of malice aforethought' have the following meanings:

" 'Willfully' means intentionally, not accidentally.

" 'Deliberately' means in a cool state of the blood. It does not mean brooded over or reflected upon for a week, or a day or an hour; but it means an intent to kill, executed in a cool state of the blood, in furtherance of a formed desire to gratify a feeling of revenge, or to accomplish some other unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some persons.

" 'Premeditatedly' means thought of beforehand, for any length of time, however short.

" 'Malice' does not mean mere spite, ill-will, or hatred, as it is ordinarily understood; but it means that condition of the mind which prompts one to take the life of another without just cause or justification; and it

signifies a state of disposition which shows a heart regardless of social duty and fatally bent on mischief.

" 'Malice aforethought' means with malice and premeditation.

"7. If you shall believe from the evidence that prior to the time of the shooting the deceased had made threats against the defendant, or that defendant had made threats against the deceased, or that each had made threats against the other, you should take such threats into consideration, together with all the other facts and circumstances appearing in evidence, in determining who was the aggressor in this case.

"8. Although you may believe from the evidence that the defendant did shoot and kill Robert T. Wall, yet, if you shall further believe from the evidence that he did so in self-defense, as hereinafter explained, you should acquit him.

"On the question of self-defense the court further instructs you as follows: If you shall believe from the evidence that, at the time of the shooting, the defendant had reasonable cause to apprehend and did apprehend, a design on the part of Mr. Wall to take his life or to do him some great personal injury, and that there was reasonable cause for him to apprehend, and he did apprehend, immediate danger of such design being accomplished, and that he shot to avert such apprehended danger, and that, at the time of the shooting, he had reasonable cause to believe, and did believe, it was necessary for him to do so to protect himself from such apprehended danger, then he had a right to do such shooting; and you should acquit him on the ground of self-defense. It is not necessary that the defendant should have been in actual or real danger, nor that the danger (if any) should have been impending and about to fall. If he had reasonable cause to believe, and did believe, he was in immediate danger of being killed or receiving some great personal injury, he had a right to act upon such belief. Whether or not he did have

reasonable cause to so believe, and whether or not he did so believe, are for you to determine from all the facts and circumstances appearing in evidence.

"If you find the defendant guilty of murder in the first degree, you should simply so state, without assessing any punishment therefor. If you find him guilty of murder in the second degree, you should assess his punishment therefor at imprisonment in the penitentiary at a term of not less than ten years.

"If you find him not guilty, you will simply so state."

The court, at the request of the defendant, gave instructions numbered 1, 9, 10 and 11, which are as follows:

"1. The court instructs the jury that the information filed in this case is a mere formal accusation, and raises no presumption against the defendant, and the jury should not permit themselves to be influenced thereby against the defendant on account of said information.

"9. The court instructs the jury that if you shall believe from the evidence that at the time defendant shot and killed Robert T. Wall he, the defendant, had reasonable cause to believe and did believe from the acts and conduct of Wall, that Wall was attempting to draw a pistol and shoot defendant, and that defendant had reasonable cause to believe and did believe that there was imminent danger of Wall so doing, then you must acquit the defendant on the ground of self-defense even though the jury may further believe that Wall was unarmed and that there was no real danger.

"10. The court instructs the jury that if they find from the evidence that the defendant had reasonable cause to believe and did believe that the deceased was about to draw a pistol at the time and place of the shooting, to shoot him, then he was not bound to flee, but had a right to defend himself from such threatened attack.

"11.  The court further instructs the jury that, although you may believe from the evidence that defendant entertained ill-will towards the deceased and had abused and threatened him, still the defendant was not thereby deprived of the right to defend himself against any attack upon him by the deceased.  And if you shall find from the evidence that defendant shot and killed the deceased in self-defense, as defined in other instructions, then you must acquit him, notwithstanding such ill-will, abuse and threats."

The first assignment of error is upon the ground that the attorney representing the State was allowed, over the objection and exception of defendant, to state to the jury in his opening statement that the testimony would show that about eight o'clock on the morning of the homicide the defendant assaulted a man named Claypool and struck him over the head with a pistol. This difficulty between defendant and Claypool had no connection or anything whatever to do with the shooting of Wall by defendant, and the statement made by the attorney representing the State to the effect that defendant assaulted Claypool with a pistol some two hours before the killing of Wall shed no light on the homicide, and should not have been made or admitted.  But this statement as to what the testimony would show was admitted by the court, over the objection of defendant, upon the theory evidently that the attorney making it would thereafter be able to show some connection between the alleged assault on Claypool and the homicide; but the attorney having failed to do this, the court at the conclusion of his statement, excluded from the consideration of the jury that part of it which related to the assault upon Claypool.  The court said:

"Gentlemen, counsel for the defendant, and the jury, the court desires to make this statement and this ruling:  Mr. Scott's statement of what the State expected to prove, the court thinks that the defendant objecting to the details of the difficulty which is alleged

to have taken place between this defendant and a man
by the name of Claypool, that that statement ought not
to be taken into consideration; nothing to show that
that had any connection with this difficulty. And, there-
fore, the defendant objected to Mr. Scott's statement
as to what took place between this defendant and Clay-
pool. That will be excluded and struck out now, and
if there should be any testimony of that kind offered it
will be excluded. There is nothing in Mr. Scott's state-
ment connecting it with Mr. Wall at all. It is imma-
terial whether Mr. Todd or Claypool was to blame in
that trouble, and does not seem to connect Mr. Wall with
it in any way, and, therefore, it is not competent or ad-
missible, and the jurors will not allow it to have any
lodgment in your minds, if you can help it.''

What more could the court do than it did? The
statement complained of had been made with its permis-
sion, and the court could not, therefore, rebuke the at-
torney. But the court's direction to the jury to disre-
gard the statements of the attorney relating to the as-
sault upon Claypool, and that any testimony which
might be offered in regard thereto would be excluded,
served as an antidote to any prejudicial effect that such
statement might have had upon the minds of the jury.
No evidence regarding the Claypool affair was offered
by the State, and as it was expressly announced by the
court from the bench that should any such evidence be
offered it would be excluded, no prejudice could possi-
bly have resulted to the defendant by reason of such
statement. While it was held in State v. Stubblefield,
157 Mo. 360, that the court erred in not rebuking the
prosecuting attorney for statements made by him in his
opening statement connecting the defendant upon trial
with crimes other than that for which he was then be-
ing tried, that case differs from the one at bar in that
the statements in that case were not made with the per-
mission of the court. Nor is the case in hand to be in-
cluded in that class of cases where the prosecuting at-

torney, in addressing the jury, speaks of matters *de hors* the record prejudicial to the defendant, and where, upon objections made by the defendant, it becomes the duty of the court to reprimand the attorney for thus transgressing, and to direct the jury to disregard such remarks, as held in the case of State v. Kring, 64 Mo. 591, and State v. Lee, 66 Mo. 165, and in this way obviate any resulting prejudice to the defendant. The statement complained of was in no sense evidence, and could not have an effect such as evidence relating to the said assault might have upon the minds of the jury, and the court's direction that it be excluded from their consideration entirely eliminated it from the case. Had evidence in support of the statement been permitted to go to the jury, it would have been prejudicial to the rights of defendant, and the wrong could not have been righted by the mere oral direction of the court from the bench to disregard it. But even after the objectionable statement had been made and after the court directed the jury to exclude it from their consideration, the attorney for defendant who made the statement of defendant's case insisted upon laying the Claypool affair before the jury, and did state some of the details thereof; nor did he desist until the court, upon objections made by the State, had several times ruled that he could not be permitted to inject the Claypool matter into the case unless by consent of the adverse counsel, which consent counsel for the State refused to give unless allowed the same privilege. We think, by this course, the defendant waived any objection he might have had in the first instance to the statement in question.

Over the objection and exception of defendant, Hugh Cox, a clerk in the drug store of Dr. Adams and a witness for the State, was permitted to testify that on the morning of the difficulty between defendant and deceased, which occurred some hours prior to the homicide, he saw deceased coming across the street from the

lumber yard towards the drug store and also saw defendant coming south towards the drug store, and heard defendant cursing deceased and calling him vile names, when witness, addressing deceased, said, "Uncle Bob, you had better come in the store," and that deceased replied, "My stars, I will have no trouble with him." The contention is that this testimony was mere hearsay, and was improperly admitted. While we agree to this, it seems clear to us that the error was non-prejudicial and that the judgment should not be reversed on that ground.

Instruction numbered five is claimed to be erroneous upon the ground that there was no testimony upon which to base it. "Where there is a willful killing with malice aforethought, that is, with malice and premeditation, but not with deliberation, or in a cool state of the blood, the offense is murder in the second degree." [State v. Curtis, 70 Mo. l. c. 600; State v. Robinson, 73 Mo. 306.] While there was evidence tending to show that the shooting and killing were done deliberately, premeditatedly and with malice, the defendant's own testimony, if true, showed that it was not done with deliberation. He stated that as deceased rode past his office he, deceased, straightened himself up in the saddle and gave defendant a very angry look, and that he did not shoot at deceased until he had proceeded some fifteen feet, checked up his horse and made a motion with his hand toward his hip pocket; that he, defendant, then stepped out in the street, drew his pistol and began shooting, and continued to shoot until deceased fell from his horse, which tended to show that the shooting was not done deliberately, but willfully, premeditatedly and of malice aforethought, rendering the homicide murder in the second degree. But even if the testimony did not warrant this instruction, the defendant is in no position to complain, for if the court erred in instructing for a lesser degree of murder than that with which the defendant is charged, it was an error in defendant's favor

of which he has no cause to complain. Section 2369, Revised Statutes 1899, provides: ''Any person found guilty of murder in the second degree, or of any degree of manslaughter, shall be punished according to the verdict of the jury, although the evidence in the case shows him to be guilty of a higher degree of homicide.'' Section 2535, Revised Statutes 1899, provides that no judgment shall be affected ''for any error committed at the instance or in favor of the defendant; nor because the evidence shows or tends to show him to be guilty of a higher degree of the offense than that of which he is convicted.'' We think it clear from the evidence that the jury might have found the defendant guilty of murder in either degree, and under such circumstances said instruction was proper. [State v. McMullin, 170 Mo. 608; State v. Frazier, 137 Mo. 317.]

Another objection urged against said instruction number 5 is that it does not indicate to the jury what facts were necessary for it to find in order to authorize a conviction of murder in the second degree. The instruction told the jury that before they could find the defendant guilty of murder in the second degree, they must believe from the evidence, beyond a reasonable doubt, that defendant, with a pistol, shot and killed Robert T. Wall, and that such shooting and killing were done wilfully, premeditatedly and of malice aforethought, but without deliberation (these terms being defined in another instruction), and thus presented to the jury all the questions necessary for them to pass upon in order to a determination of the guilt or innocence of defendant of murder in the second degree. In speaking of a similar instruction in State v. Bauerle, 145 Mo. l. c. 18, GANTT, J., said:

''The court gave the following instruction: 'The court instructs the jury that if you believe and find from the evidence in this cause, beyond a reasonable doubt, that the defendant, at the county of Lafayette and State of Missouri, on or about the 26th day of April,

1896, willfully, premeditatedly and of his malice afore-thought shot and killed one Amelia Bauerle, but without deliberation, you will find defendant guilty of murder in the second degree and will assess his punishment at imprisonment in the penitentiary for a term of not less than ten years.' It had already defined the meaning of deliberation, premeditation and malice afore-thought. Defendant insists that this instruction is misleading and should not have been given. It is sufficient to say that this instruction has been approved a score of times by this court, and is the settled law of this State. [State v. Moxley, 115 Mo. 644; s. c., 102 Mo. 347.]''

The defendant contends that the court should have given an instruction on manslaughter in the fourth degree. To authorize such an instruction there must have been evidence tending to show that the defendant, in the heat of passion induced by reasonable provocation, without malice and without premeditation, shot and killed the deceased, which the evidence in this case does not show; ''and the passion which will reduce homicide to the grade of manslaughter is an excited state of mind produced by some lawful provocation, such as a blow or an assault of any kind upon the person.'' [State v. Ellis, 74 Mo. 207.] In State v. McKenzie, 177 Mo. l. c. 712, it is said: ''Manslaughter in the fourth degree, under the statutes of this State, is the intentional killing of a human being in a heat of passion on a reasonable provocation, without malice and without premeditation, and under circumstances which will not render the killing justifiable or excusable homicide; and as a general rule it takes an assault, with personal violence, to constitute such provocation.'' The same rule is announced in State v. Sumpter, 153 Mo. 436; State v. Meadows, 156 Mo. 110; State v. Brown, 64 Mo. 367; State v. Diller, 170 Mo. 1; State v. Ashcraft, 170 Mo. 409; State v. Kindred, 148 Mo. 270; State v. Gartrell, 171 Mo. 489. None of the authorities cited by defendant

are to the contrary. There was no evidence that deceased made any remarks whatever to or in the presence of defendant, or that he made any assault upon him at the time of the homicide, and there was, therefore, nothing upon which to base an instruction for manslaughter.

The instructions were such as have been frequently approved by this court, they covered every phase of the case and were very fair to the defendant, especially upon the question of self-defense. There was ample evidence to authorize and sustain the verdict. Our conclusion is that the judgment should be affirmed. It is so ordered. All concur.